Good morning. You may be seated. This is our second case of the day. People of the State of Illinois v. Anthony Meads, No. 4-13-0802. For the appellant, we have Attorney James Williams. And for the affilee, we have Attorney David Robinson. Mr. Robinson, Mr. Williams, are you ready to proceed? All right, you may do so. May it please the Court. Counsel. Mr. Robinson, my name is James Ryan Williams, and on behalf of the Office of the State Appellate Defender, it is my privilege to represent Anthony Meads before this Honorable Court. Anthony Meads is a young man who was denied a fair trial, he was denied the effective assistance of counsel, and he was, in part because of those reasons, wrongfully convicted of first-degree murder. Anthony now faces a de facto life sentence of 50 years in prison for a murder that the State concedes Treshon J committed. I'd like to begin by discussing the third argument in briefing and effective assistance of counsel. Anthony was denied the right to testify in his own defense because his attorney incorrectly advised him on the law. And the right to testify, this is a right that is not only a fundamental right, this is perhaps the most basic protection in an adversarial system such as ours. As Anthony explained in a series of post-trial letters that he wrote to the trial court, he wanted to testify in his own defense, and he would have testified in his own defense. However, his attorney, James Dedman, incorrectly advised him that if he testified, he would be impeached and therefore look bad in front of the jury with a prior home invasion charge, which of course is incorrect advice. Because of these claims, the trial court appointed the public defender to represent Anthony at a Krenkel hearing where he testified in the same. Mr. Dedman was given the opportunity to explain himself at this hearing. Mr. Dedman did not deny incorrectly advising Anthony. He did not explain that he knows the well-established law and would not have so advised Anthony. Instead, he repeatedly simply stated that he did not recall advising Anthony. And it's important to point out that when you look in the colloquy here, Mr. Dedman is answering these questions, yes, no, yes, no. He remembers what's going on in this trial. Yet in each instance where he's given the opportunity to explain whether or not he incorrectly advised Anthony, suddenly he doesn't recall. Counsel, how was your client prejudiced by this? I mean, if I'm recalling correctly from the record, your client did testify at that hearing and went into what he would have said had he been allowed to testify. You're correct, Your Honor. However, because of the fundamental nature of the right to testify, prejudice in a circumstance like this can be established by if there's a reasonable likelihood that he would have testified. In this way, it's irrelevant what he would have testified. What's relevant is the fact that he was denied the right to testify. I mean, to that end, I'll just note for the Court that some states have even recognized this as structural error, a circumstance like this. Now, of course, the judge here made no factual findings. He made no credibility determinations as to whether Anthony was so advised, whether this was incorrect advice, whether it affected Anthony's decision. And so I submit to this Court that in a circumstance like this where we have sworn testimony, it's unrebutted, there are no contrary factual findings, and the testimony is not inherently unbelievable. I submit to this Court that in stepping into the shoes of the trial court deciding the ineffectiveness claim, that this Court should take the testimony as true. And, of course, if this testimony is taken as true, it clearly demonstrates that Anthony was denied the effective assistance of counsel. Incorrect advice, of course, is never a matter of trial strategy, which satisfies the deficiency prong of the Strickland analysis. And, again, in a circumstance like this, prejudice can be, as the state agrees, prejudice can be established if there is a reasonable likelihood that he would have testified. And, again, if taken as true, Anthony's testimony establishes that he would have, in fact, testified. And so this record does establish that he was denied the effective assistance of counsel. The fact is, Anthony had a fundamental right to decide whether or not to testify on his own behalf. And, more importantly, he had the right to make that decision unaffected by incorrect advice. Counsel, would it have been likely that he would have testified given the advice his counsel gave him with respect to his statement that was recorded, and how well he did in dodging certain questions, and what he would be confronted with if he were to take the stand? Your Honor, there may have been other reasons not to testify. However, what we have is Anthony's sworn testimony at a Krankel hearing where he explains that he wanted to testify, that he would have testified. And that's what we have here, Your Honor. So even though there may have been some other reason for him not to testify, even if... I guess I'm wondering, how does that play into the analysis of it's reasonably likely that he would have testified? I don't believe, I mean, just because there may have been some other reason for him not to testify, I do not believe that that in any way undermines his sworn testimony at the Krankel hearing that he wanted to testify and that he would have testified. But again, the fact is, he did not get this opportunity to testify. He made what proved to be a life-altering decision based on incorrect legal advice. And it's for that reason that I ask that this Court find that he was denied the effective assistance of counsel, and therefore grant him a new trial. I'd also like to discuss, of course, the evidence in this case, which is obviously very weak. So as this Court knows, there was a fight out in Cruising Lane, Champaign, Illinois. Roughly 30 people gathered to see this fight between a couple of men who exchanged words for a few minutes. The State interviewed 20 people. From those 20 people, the State calls five eyewitnesses to testify at Anthony's trial. It should be noted, these are people that are friends or family or in some way otherwise associated with Desiree, who of course is the victim here. And yet none of these people in any way suggested that Anthony was involved in this fight or this shooting. These are people who themselves were either directly involved or, at a minimum, witnessed everything. And yet none of them even suggested that he was present during or involved in this shooting or street altercation. What about your client's representation that he was there? Yes, Your Honor. I'm sorry. No, go ahead. You're fine. Yes, you're right, Your Honor. Anthony did admit to the police that he was in the yard whenever this altercation transpired. And he followed one gang and pushing out another gang out of the neighborhood. Absolutely, Your Honor. However, nothing in the record suggested that at any time that that occurred before or during the shooting, which is what caused Desiree's death. The State here, I think it's important to note, the State here had the burden to prove that he did some act before or during the shooting that in some way aided and abetted the shooting. And yet it inexplicably made the strategic decision not to ask its own witnesses if Anthony was even involved in this fight or this shooting. It didn't even ask if anybody saw him before or during the shooting. I mean, what does that say about the State's own assessment of the strength of its evidence? It didn't even ask its own witnesses these most basic questions. Johnny, the very first witness that the State called here, Johnny Campbell, he's a young man who knew Anthony from high school. He admitted he didn't particularly care for Anthony. He was directly involved in this fight, in this shooting. In fact, he was one of the alleged targets of this shooting. And yet when asked in cross-examination, did he even see Anthony that night? He said no, which seems exceedingly unlikely if, as the State represented in its brief, that Anthony was actively involved in this fight. Nothing suggests that he was. Rajon Campbell, Johnny's older brother, also actively involved in this fight, also an alleged target of the shooting. And yet let me first note, this fight was going on out in the street for a couple of minutes where they're just exchanging words. And yet none of the people that are in that fight suggested that Anthony had any involvement in this fight or the shooting that transpires. Tiffany, I should note, so Rajon and Johnny, neither of these two people saw Anthony. But Rajon did say that he saw maybe, what, four or five other people with the shooter in the street prior to everything erupting, so to speak. I believe, Your Honor, when Rajon was asked how many people were involved in this incident, he did estimate that I believe it was five or six people that he estimated, which may have included himself and Johnny. But in any event, that's entirely contradicted by everything else in the record. And it's contradicted, most importantly, by the uniform testimony of the three people who did see Anthony that night. There were three women. Tiffany, first woman, she testifies. She witnessed this entire sequence of events. She was there the entire time when asked at trial who was involved. Unequivocally stated, Treshawn, Antoine, and Phil. Uncontradicted testimony. She's a young woman who was familiar with, who knew Anthony. And yet, according to her testimony, he only enters this sequence of events sometime after the shooting, after the act that caused death. And it's important to note, she was actually interviewed the night of the shooting, the next day. Never mentions Anthony at all. When asked at trial, why didn't you mention Anthony? Her explanation, I was only asked who was involved in this thing. That's why she didn't mention Anthony. Guinness, he essentially testified the same thing. There through everything. Witnessed everything. Out there in the street. When asked, who was involved in this? Unequivocally states, Treshawn, Antoine, and Phil. No mention of Anthony. Again, this is a young woman who knew Anthony. And again, according to her testimony, only enters this sequence of events sometime after the shooting. And then finally, there's Renice. This is a woman, Desiree's cousin, in fact. She was not actually out in the street, but she testified that because of the commotion of the young men out arguing in the street. Steps out on the front porch. Witnesses everything. She said she could tell for sure this fight was between Treshawn and Antoine, and Johnny and Rajon. She does see a person who fits Anthony's description. She doesn't ID him in a technical sense, but admittedly, the description fit Anthony. Nonetheless, again, only enters this sequence of events after the shooting. The fact is, there is nothing in this record that suggests that Anthony had any involvement in this fight, or this shooting, or that he had any involvement in this sequence of events before or during the shooting. There's nothing in the record. But this is my question. Are we allowed to draw inferences from behavior observed subsequent to the shooting to determine who was involved in the shooting? Your Honor, I do believe that there is some case law that suggests that you can draw inferences. But I think it's extremely important to note in this case, this is not a matter where the state's relegated to making its case based on circumstantial evidence. Where we have nothing but these acts after the murder that somehow support the inference that he was involved in this. This is a case where the state interviewed 20 people who saw all of this. Apparently, none of them suggested Anthony was involved. The state calls five people. The five people the state chose to make its case against Anthony, none of them suggested he was involved. So to me, it seems entirely inappropriate to suggest that, okay, well, he was caught with a murder weapon after the scene. You know, these bad facts that all of which, everything the state points to in its briefing, everything the state pointed to at trial, it's nothing but things that occurred after the act that caused death. So are you suggesting that because the state didn't maybe take the best route in proving their case, that somehow, you know, we say because you didn't ask your witnesses, that plays into whether or not it was proved beyond a reasonable doubt? Well, I just think that that's, as a practical matter, I think that it's just worth noting that. Obviously, this court cannot decide this case on, well, you didn't even ask the question. I don't think that that's accurate. But I do think it's important just to note, to keep in mind, that the state did not even ask its own witnesses if Anthony was involved in the crime that they're charging him for. They didn't even ask. And of course, here, the state's central theory, felony murder. The fact is, again, any criminal act that Anthony committed in this sequence of events only occurred after the act causing death. And that does not support criminal liability under the felony murder statute. So even if Anthony committed this mob action, even if he aided and abetted this mob action and in that way committed the mob action, which, of course, as I explained in the briefing, I don't believe he did either. But even if he did, this record is clear that his involvement in this sequence of events only occurred after the act that caused death. Felony murder depends solely on the cause and effect relationship between the defendant's conduct and the resulting death to impose liability. The defendant must have set into motion the events that led to the death or in some way contributed to the death. But of course, where his initial criminal act occurs only after the act that caused death, he could not have contributed to that death. There is no cause and effect relationship between his conduct and the resulting death. There can be no criminal liability here. Anthony, a person in this situation such as Anthony, is at worst what has been called, not expressly recognized in our state, but what has been called a late joining aider and abetter, which is essentially just somebody who joins a felonious enterprise, felonious activity, but only after the act that has caused death. But again, felony murder statute does not apply to such a person. And what we have here, we have this fight, again, out in the street, going on for a couple of minutes. These people are actively involved. Seemingly to everyone's surprise, Treshawn Jay pulls out a gun, starts shooting. At this point in time, people scatter. People take cover. Rejon and Johnny, they hid behind this SUV until the shooting stopped. They run down the street to Tiffany's house. They say they hear no shots thereafter. People start collecting themselves. They see that unfortunately Desiree is in the street. People go to her aid. They summons 911. And it is only at this point in time, this is the very first moment in this entire case where any of the evidence suggests that Anthony actively enters this sequence of events. It's only after the act that has caused death. And because of that, he simply cannot be held criminally liable for this murder. It is causally unrelated to his conduct. Finally, I'd like to briefly just address the prosecutorial misconduct in this case. The state obviously had a very weak case here. And it met those weaknesses with a pattern of misconduct. It seems that it filled essentially each hole in its case with an instance of misconduct. The state concedes a number of these. I think I raised, I believe it's 15 separate instances of misconduct I raised in my briefing. One example, the women stated that three people involved, Treshawn, Antoine, and Phil, again, unequivocal. How does the state recount this information to the jury? Oh, well, you know, you heard what the women said. There were three to five people involved. It was Treshawn, Antoine, Phil, and Anthony out there in the street. She just injects him into this situation where none of the evidence suggests that he was out there. She just does this. Another major hole in the state's case here, this shooting, by all accounts, it starts out in the street, occurs entirely out in the street. Anthony is seen with a shotgun afterwards. There's this giant, but, of course, there's no shotgun shells out there suggesting he was actually involved in that shooting that led to the death. But, of course, there is this one shotgun shell, and it's up in the yard, and it's up in this rather large pile of bullet shells, which, of course, Tiffany explained. These bullet shells, she didn't explain it in those terms, but she did explain that there were people in that yard earlier in the day firing off guns, probably because it was Fourth of July, maybe get away with it. But Tiffany explains this, essentially, this pile of bullets in the yard. Even though nothing suggests that that pile of bullets in the yard is related to this murder that, by all accounts, started and occurred out in the street, the state incorporates those bullets in the yard out into the shooting in the street. And this is particularly prejudicial because this is, if anything, the lone piece of evidence that, in any way, suggests that Anthony possibly could have been involved in this thing. And the state concedes, in its briefing, that some of these bullets, at least, or, excuse me, shell casings, that were up in the yard were from the earlier shootings. Another problem, no fingerprints. Anthony's fingerprints and DNA aren't on anything. How does the state convey that information to the jury? In closing argument, oh, well, shooting bullets out of a gun destroys DNA. That's not true, and the state concedes that that's not true. Was there any evidence in the record to support that statement? No, there wasn't. She just said it. Again, so the Illinois Supreme Court has, and let me point out, this is, I think I've described, three of the 15 instances addressed in the briefing. The Illinois Supreme Court has recognized the synergistic effect of a pattern of misconduct like this can deny a fair trial. We have no shortage of it. From the various appeals to juror motions to the near relentless misstatements of fact, testimony, and improper arguments in the closing argument, there are but a few pages in the record that don't contain a misstatement of fact or testimony. Counsel, let me interrupt you. I see you're almost out of time. Can you talk a little bit about the photographs that went back to the jury and also the video that showed the attempts to resuscitate the victim? Yeah, it would be my pleasure, Your Honor. As to the photograph, at the end of trial, the jury, and let me point out, they were deliberating for over five hours. The jury is back to their delivery. The jury specifically asked, Your Honor, can we get a photo of Treshawn and Anthony? The statement at that request, they send back three photos, Treshawn, Anthony, and an 8 by 10 photo that's a close-up of Desiree's face. She's smiling. It's a beautiful picture of her. And they send this back in what I describe as a critical time in deliberations when the jury is trying to decide Anthony's fate, and they send this back. As to the video. How does that happen? Maybe I should ask Mr. Robinson. Did the trial judge look at the exhibits before they went back? What happened to the defense attorney? Were they all sleeping? I think that that would be a generous statement to suggest that this defense attorney was sleeping. This defense attorney did nothing. This is embarrassing what this defense attorney did for this young man. He literally sat there and did nothing. He got up in closing argument and said they should disbelieve all these people that essentially just said Anthony wasn't involved. He said that they're all part of this mob action and just as guilty as Anthony. He says this in closing argument. The defense attorney says this in closing argument. This defense attorney did nothing. Was he retained? He wasn't. I see that I'm out of time. We'll have more time on rebuttal. Okay. Thank you, Your Honors. I would just like to say I would like to request that this court vacate Anthony's conviction in a 50-year sentence. Thank you for your time. Thank you, counsel. Mr. Robinson? May it please the court? Counsel? Justice Holderwhite asked the question, are we allowed to draw inferences post-conduct? This court is absolutely permitted to draw inferences post-conduct and it has, and Justice Connick has, concurred in two recent opinions that talk about it. In one of those cases, Justice Holderwhite was lauded by Justice Steitman, who was the authoring judge, for admitting such evidence. Those cases were Phillips and Grimes. Those were cases involving accountability. I'll talk in depth about felony murder and accountability shortly. Initially, I also want to address this issue of prosecutorial misconduct. There's a series of things that happened in this case that led to the allegations of prosecutorial misconduct. I noticed Justice Pope seemed somewhat dissatisfied with the representation of the State's closing argument during the opening here. There are four basic things that the defendant complains about here. One is the testimony about the victim, and you'll see that in the defendant's brief, the quote-unquote death video, the photos that were presented to the jury that Justice Holderwhite brought up, and then the alleged misstatements of fact at closing. There were 14 or 15 of these allegations. Let's talk first about this alleged testimony about the victim being so prejudicial and horrible. If there's any doubt in any panelist's mind in this case about the prosecutorial misconduct in particular, but also the sufficiency of the State's case, I would challenge each member of the panel to read the record in full. Look at all of the exhibits. Read the defendant's statement to police on the night this happened. Look at this video that the defendant alleges is a death video. And then look at the record with respect to the request from the jury for these photographs and the interaction between the State's attorney and the trial judge, who is the individual responsible for submitting the exhibits to the jury post-request, and the defendant's utter acquiescence in permitting that to go to the jury. I actually disagree with defense counsel in this regard. I think not only did defense counsel below do an adequate job, given the facts in this case, I think counsel did what they could to try to demonstrate that the State didn't meet its burden of proof. Mr. Robinson, you said the defense attorney acquiesced in the photographs going back. That's correct. Did he look at them? Can you tell from the record? Why would he agree to letting, first of all, the jury requested the pictures of the defendant and Treshawn, right? Yes, Your Honor. So why is the picture of the victim going back to the jury? It shouldn't be as part of that request. But we don't know why defense counsel did that. Maybe defense counsel thought. No, why is the State sending it back? Why is the State saying here's A, B, and C? Your Honor, respectfully, the State doesn't send it back. The trial judge sends it back. But the State gives it to the trial judge in saying here's A, B, and C, which we had a request for photos of two people. That's correct. And we've got A, B, and C, which is three, being given to the trial court. So I understand what you're saying, that the judge is the gatekeeper and the one who looks at it and gives it to the bailiff, and they take it to the jury. But why did the State hand up A, B, and C? An accident, inadvertent. Look, in context, this is why I point to the record in reviewing this. The idea is here, the defendant posits in his brief that this is some quote-unquote ploy by the State's attorney to prejudice the jury with respect to this photo without a shred of evidence. Let's say, for example, there was an intern or an assistant State's attorney who had a record of this. That's not what happened here. There's no evidence of that in this case. It was a mistake. And, Mr. Robinson, you probably haven't seen the pictures. I understand you're here kind of... I have seen them. I've reviewed the entire record, Your Honor. Well, it's pretty blatant that Desiree is not one of the two people whose picture was requested. That's true, and that's why we cannot say on this cold record that there was any nefarious objective. Let's assume that it was totally an accident. The defense counsel is stupid and the judge is totally asleep. Why should that harm the defendant? Because I take it that you would be willing to concede that that was not a good thing. It is the pictures of the two gentlemen. They're mopes. She's charming. Young. Full of life. Sure, and this goes to prejudice. I might concede that the... I shouldn't say I might concede. I do concede that this was an error. They asked for the two pictures. It's obviously an error. The question here is couched as prosecutorial misconduct under Blue and Johnson, not as ineffective assistants of counsel. I understand, but isn't that, if it's considered separately, isn't it an unfortunate event for the defendant? It's very unfortunate in this sense, and I hate to sound cliche, but a defendant is entitled to a fair trial, not a perfect trial. This was an error. It was an accident, Your Honor. There's no evidence whatsoever, and in reading this in context, if this were a ploy, as the defendant suggests, it was the worst doggone ploy I've ever seen employed by an assistant state's attorney, which is to try to slip in evidence and then show it to the judge and show it to defense counsel before you do it. It's an awfully bad plan. Well, you've already got the wonderful evidence in about how sweet she is and who she's married to. If you get that in front of this judge and this defense attorney, you can do whatever you want, apparently. I'm glad you brought that up because this is part of what I view to be a faux mosaic prepared by the defense in this case. The testimony about the victim was a third as long as the defendant's summary in his brief. When you look at this witness that's called the victim's aunt, the state asked a number of initial questions about who she was and what her background was. The aunt responded to those questions. Even though this defendant stipulated to the fact that this is the person that died here, the state's always entitled to prove that. But that's not the only reason that I believe the state was entitled to elicit additional evidence from this witness, although on that basis, it's sufficient. Part of the defendant's defense in this case was, in fact, and this is really illuminated if you take a look at the record and look at the closing argument, was really driven at, look, maybe there's another explanation. How do we know? This is a bunch of gang members and folks that are affiliated with gangs standing out here. How do we know someone else didn't want her dead? That was part of the defense in this case, that someone didn't take advantage of this situation, come up and essentially assassinate her under the guise of stray bullets. Well, part of what the state had to present in this case was that she was not affiliated with any of these folks, like the defendant. She was an innocent bystander who had two children and a husband who happened to be in service, right, no mention of the military. The word service was used, was in service in another state. That's the entirety of the testimony that was presented in that regard. So that's being proactive. Because it comes in first. It does, and I believe it. In the prosecution's case. That would presuppose that the – I understand where you're going, Your Honor, but that would presuppose that the state had no idea what the defense was intending to present. They've seen the same law and order episode that defense counsel had. It was a double-secret assassination in the midst of a gang murder. Given the evidence, which I will go over, and I vehemently disagree with the defense in this case, there is, particularly in light of Grimes and Phillips on the accountability charge, overwhelming evidence that the defendant was guilty. You've piqued my interest, Mr. Robinson. I want to hear that. I think the best way to illustrate this is to go through so that you can But as an initial matter, I will just tick through a little bit of the evidence that was presented by the state to prove these points, and then I will walk through what I believe, looking at the record, is what the jury saw on the large chart that they referred to in the record. One, defendant's statement that he was, quote, posted at 1607. Two, the proximity of the defendant's location to the flight. Three, the location of all the shell casings. Not just the number, but the location of the shell casings. The testimony of Gweneisha and Tiffany immediately following it. If you remember from Phillips and Grimes, part of what the court was permitted to consider on appeal because the fact finder was able to consider it was the idea that together, Shaughnessy, Grimes, and Mr. Phillips threw the rifle, in that case, into the Sangamon River post-shooting. Here, they didn't throw it in the river. Defendant put it in his pants, and I'll explain why I think that took place and why that's a reasonable, logical inference in this case. Five, defendant's presence at the scene. The state didn't have to elicit defendant's presence from any witness in this case. He admitted he was there. Six, defendant is arrested with the murder weapon. Again, from Grimes and Phillips, this is well accepted. This goes back to a place where I wanted to start, and that is on what I believe is the most meaty charge in this case, very easily provable. I believe he's also guilty of felony murder. There's a general verdict for him here, but he's clearly accountable for this first-degree murder. Defendant makes some hay in his brief about how the state had to demonstrate mob action in order to get there so that he's accountable for mob action. Unfortunately, for a defendant, that goes to the felony murder charge. Defendant was not found accountable for mob action here. The defendant was found accountable for first-degree murder. Now, under the Accountability Statute 5-2C, either before or during the commission of an offense, and with the intent to promote and facilitate that commission, he or she solicits aids and events. That's the first part. I know this Court is well aware that there's a two-pronged approach to accountability. One is intent. I intend to aid, abet, so on and so forth. The second is common criminal design. And common criminal design is precisely what the state proved here in spades. Common criminal design. Any act in furtherance of that common design committed by one party are considered to be the acts of all the parties to the common design or agreement and are all equally responsible for the consequences of those actions. Pausing here. That's exactly what we have here. Now, defendant says, but wait a second. Being at the scene isn't enough. Okay, so let's say the state said I was at the scene and I was there shortly thereafter. Being associated with people who commit crimes isn't enough. The statute speaks to that. It goes on. Mere presence at the scene of the crime does not render a person accountable for an offense. Semi-quote. A person's presence at the scene of a crime, however, may be considered with other circumstances by their trier of fact when determining accountability. Here, the legislature is specifically anticipating this type of case and the type of case that we saw in Grimes and Phillips where you have to make logical inferences because the legislature and the people of the state recognize that defendants often don't come forward and say, oh, yeah, we were out there gang-banging, running around, firing weapons up and down the street, and telling on each other. They recognize that sometimes the state has to put its case together through logical, reasonable inferences. Now, back to my point about laying the scene. This is important because when I initially picked this case up and read defendant's brief, I thought, well, this is not good because it reads as if the defendant is off in some yard a quarter mile away where all this action is taking place in the street. In fact, and this goes back to the exhibit that was presented to the jury where they could see where these houses were located and where the shooting took place, where the victim fell. 1607, 1605, 1603. Five houses down from the corner of Thornton and Cruising where the body was found. And I'm going to tie this back to this alleged prosecutorial misconduct shortly. Right out in front of the center house, 1605, where the witness testified she came out on her porch and saw this go down. Right out in front of her house in the street. People are losing their shirts, getting ready to testify. It escalates. Defendant admits in his statement that he is quote unquote posted at 1607, the house right next door. He's posted and in his statement doesn't say I wasn't there, I wasn't involved in all this. He says, well, I didn't fire the shotgun. I just hit a guy who had the shotgun with the stick, knocked it out of his hands, picked it up and put it in the trunk of my Buick. Okay, maybe that's true. I doubt it, but maybe that's true. He places himself at the scene and he's actively involved by that statement in this common design, which is the fist fight, this potentially felonious conduct that's going to take place in the street. It doesn't even have to get to mob action, although it does. Then 1603, the house right next to 1605 where this fight's taking place, is where the black SUV is parked. And this is where the Campbell brothers take refuge behind the car and then cut across as they flee the gunfire to Tiffany's house, which is right around the corner on Thornton. Now, backing up to 1607 where the defendant is posted. A series of 9mm shell casings are found there. Seven .45 caliber shell casings are found there. At the other end, so now the fight, that's on, looking at it, that's on the left side of the fight, firing east toward where the victim is lying. There are also seven .40 caliber shells on the other side of 1605, which would have been firing back toward defendant and his gang affiliations. The victim is lying in the street. There's a shotgun shell found in the yard at 1607. There's a shotgun shell later found at the corner of Thornton, headed toward Hedge, which is the street that's north of cruising. That is where the two, Granisha and Tiffany, testified. They were over the body when defendant came up and fired the shots. Now, I want to pause here because this is where I think it is very, very vital that anyone who has any question about prosecutorial misconduct in this case and the evidence looks at the dash cam video that was provided here. It's dark when the police show up. They pull up to that corner of Thornton and cruising, and that's four or five houses down from 1603. It's sort of a close neighborhood proximity situation. The victim is lying at the end of that street. The police are 25 or 30 yards back, the squad car, shining the dash cam onto this alleged death video. I'm getting close to my time expiring, but I'd like an opportunity to finish this because I think it's vital. They're shining this light onto this. I watched the video twice. You cannot see the victim. The victim is lying. It's shadowy. It's dark. There are a number of police officers trying to keep people back, including the defendant. The reason that the state presented this video was not because it was some wild death video that was going to inflame the jury, but because it showed the defendant. This is precisely why the jury wanted to see the photos of the defendant at the time and what he wore that night on that video. They wanted to see if that was the guy that seemed to be intimidating Tiffany and Guanesha when the police were there under the guise of, I'm going up to check and make sure this is not my sister, when by that time he knew for sure it wasn't his sister. That was the state's case. Now, the defendant might not agree with that, but that's certainly all reasonable inferences from the case. It certainly is not prosecutorial misconduct for the state to play the dash cam video that shows that and represents the crowd and places the defendant there to corroborate the state's case. The dash cam video doesn't necessarily represent the crowd that was there when this took place because the crowd has dispersed, correct? Not the crowd in that sense. That's correct, Your Honor. What I mean by that. Also, with respect to the video does not show the body. The body is covered. It's illuminated, but you can definitely see the officer trying to resuscitate her, pumping on the chest area of what we presume to be the victim. Sure. And certainly in the context of when it was played at trial, I mean that's, I'm talking about reasonable inferences. That would certainly be, I see that my time has expired. May I finish? Yes, please. That is certainly a reasonable, logical inference that based on that video you could draw. My point is in crafting this, Mr. Williams is a very fine attorney. He crafts this argument by citing to the testimony of the officer who says, well, what happened when you arrived? I arrived, her eyes were open. He immediately follows that up by saying the state then presented the video, which implies that on the heels of that testimony, the state played this for the graphic effect of demonstrating that somehow we're trying to inflame the jury to show that there's a dead body here. This was what the state's case was all about. They tied the defendant to the scene because he was at 1607 with the shotgun. By his own admission, maybe he didn't have the shotgun immediately, but at some point held the shotgun during the altercation and alleged that he swung some stick to knock it out of his hand, puts himself there. You get to the end of the street where immediately Tiffany and Granisha say, where are those N-words at? As if he's chasing them. Those are all reasonable inferences to show that this was a common design that led to that, and Grice and Phillips stand for that proposition. Can you identify the defendant in the video? Absolutely. In fact, I said it's 25 or 30 yards away maybe, but I would say at this point they're coming up to the corner of Thornton and cruising, and many of these actors are moving in and out of the frame. And don't forget, when they arrived, when the police arrived, this was after. You're telling me more than I asked. I'm asking, if you look at the video. Yes, absolutely. You see the defendant. You do. Do you have a time for that, Mr. Robinson? I don't. But what you'll notice when you view the video is that the defendant is the individual that the police officer manually has to push back away from the police line. That's the person that you're looking for. And the reason why I know that's him is the same reason the jury knew it was him, because they identify him by the clothes that he was wearing and the testimony presented in total. Thank you, Mr. Robinson. You're out of time. Thank you. Mr. Williams, do you have a rebuttal? Yes, Your Honor. Anything? I'd like to start with the video. So, of course, this video does show Anthony. I would perhaps concede to that extent it's relevant at that point in time. But it's also important to point out, and please forgive me, I don't have the exact time, of course, but I believe that this video runs for roughly five minutes of this officer working on this young woman for five minutes before Anthony enters this scene. So although it may have been relevant towards the end of the video, so to speak, this showing this officer working on this young woman who is senselessly lost for life, it seems like in context it appears to be a ploy to inflame the jury. A defense counsel object? My very next point, Your Honor. That's what I wanted to point out. State says defense counsel did a fine job here. And I must concede I inadvertently made a mistake in my reply brief. I said defense counsel made no objections. That's, of course, not true. Because there was one instance where the judge asked him, sir, are you going to object to that? And he says no. The judge explains, well, this is why I think you should object. And he says, well, in that case, I think I will. That's the lone objection. So we have one objection. So I do apologize for my mistake in the reply brief. As to the photo, again, Mr. Robinson suggests that, well, this might have been a mistake. Well, just as there's no evidence, no direct evidence that it was any malicious intent, there's no evidence that it was a mistake. And, frankly, given the coalescence of facts, all the misconduct that preceded this photo, it doesn't seem to me like it's reasonable to suggest that it's merely a mistake. It certainly seems like a concerted effort. The other thing, I have to point out, Ms. Hughes, admittedly, she only testified for two or three pages in the record. However, it has to be pointed out that the state called her up there and deliberately elicited each piece of this information that Desiree was a mother. I mean, this was not stuff that was gratuitously stated. It's not like Ms. Hughes went up there and just by chance mentioned that she had children, which would perhaps be somewhat more acceptable. The state literally elicits each piece of this information. The state says, does she have siblings? Yes. Well, how many? Three brothers. Two sisters, I think it was. Every piece of this information. Does she have kids? Yes. How many? Two. What are their names? Samaya and Samaj, I believe they were. How old are they? Two and three years old when their mother was taken from them. I mean, this stuff was deliberately elicited. As to the notion of the common design here, again, I'm just going to, and I don't mean to repeat myself so much, but again, even if Anthony joined this common design, this common criminal intent, in any event, nothing in the record suggests that he did this before the act that caused death. And as to these, it seemed like Mr. Robinson was suggesting a number of conspiracy theories of sort here that I'm really not familiar with, and I have thoroughly read this record. But these various suggestions, I mean, I just don't think the state should be trying to take somebody's entire life from them. Fifty years in prison this young man is facing, and the state's offering to this court conspiracy theories about how he may or may not have been involved. I don't understand what you mean by conspiracy theories. Well, this notion, I do apologize, Your Honor. This notion about this, what did he call this, secret assassin. Well, did the defense say anything about or propose that she may have been killed purposefully rather than inadvertently? Your Honor, I have to, unfortunately, I have to concede that I'm not familiar with anything in the record that would go to that point. There may well be, I mean, this defense attorney droned on for, I believe it was roughly 20 pages, in his closing argument, where he, it just, it seems like he was not paying attention at all at trial. I mean, it's as if somebody just walked in and just decided to say some things on behalf of a young man who was facing losing essentially his entire life. And I understand that there are cases where the state is relegated to relying on logical inferences because they have nothing more. This is not one of those cases. This is a case where there were 20 people the state interviewed who saw this entire thing. There were five people who were actively involved in this, all of which saw all of this go down. None of these people at the time, immediately after the shooting, or even in their testimony, none of these people suggested that Anthony was involved in this matter at any time before the shooting occurred that led to the death. And so I respectfully ask that this court vacate Anthony's conviction and his 50-year prison sentence. Or alternatively, I ask that you at least give him a new trial so that he might have the opportunity to have a fair determination of his fate, assisted by the effective assistance of counsel. Thank you very much for your time. Thank you, counsel. We'll take... Oh yeah, you did an excellent job. Both of you did. Thank you. Very, very good argument. So we'll take this matter under advisement. We'll stand and recess. Thank you for your time, Your Honor.